

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>SHAWN NAOLU LEE, and<br>MICKEY TANADI | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>MJ 17 - 2030 |

Complaint for violation of Title 18, United States Code, Sections 371, 545

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALKA SAGAR | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. §§ 371, 545]

Conspiracy to commit an offense or to defraud the United States, namely to smuggle Asian arowanas from Indonesia to the United States.





BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Adam Diehl |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – United States Fish and Wildlife Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | | DATE<br>August 10, 2017 |
|---|---|---|
| ALKA SAGAR | | |

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSAs Amanda M. Bettinelli/Erik Silber    x0470/2231    REC: Detention

**AFFIDAVIT**

I, Adam Diehl, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement ("OLE"), stationed in Torrance, California.  I am authorized by the Secretary of the Interior to conduct searches and seizures and to make arrests, as authorized by law, pursuant to the Lacey Act, Title 16, United States Code, Section 3371 et seq.  I am an investigative law enforcement officer of the United States within meaning of Title 16, United States Code, Section 3375, and a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.  I have been so employed since May of 2016.

2.    I was previously employed as a Special Agent with the Department of Justice, Drug Enforcement Administration ("DEA") in Los Angeles, California, for approximately two years, and as a Law Enforcement Officer with the United States Forest Service, Law Enforcement and Investigations in Southern California for approximately six years.  I received a Bachelor's degree in Social and Criminal Justice from Ashford University in July of 2013.  I am also a graduate of the Fullerton College Police Academy in Fullerton, California, the Land Management Police Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, the DEA Basic Special Agent Academy in Quantico, Virginia, and the USFWS Special Agent Basic School

1

("SABS") at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.     During the last nine years, I have conducted several complex investigations involving the protection of natural resources and property of the United States, arson, firearms violations, narcotics trafficking, money laundering, and fish and wildlife violations.  Since my employment with the USFWS in 2016, I have conducted, or been involved in, multiple criminal investigations and search warrants relating to the illegal commercialization of protected fish and wildlife, wildlife trafficking on the internet and social media, international smuggling, false labeling of wildlife products, and violations of federal fish and wildlife laws.  I have read, studied and received training on the laws enforced by the USFWS.  I have also received advanced training in numerous aspects of criminal investigative techniques, including electronic surveillance, postal interdiction and the detection of undeclared wildlife, and wildlife concealment techniques, surveillance, email search warrants, and the application of undercover techniques for domestic and international criminal investigations.

## II. PURPOSE OF AFFIDAVIT

4.     This affidavit is made in support of a criminal complaint charging SHAWN NAOLU LEE and MICKEY TANADI with conspiracy to commit an offense or to defraud the United States, in violation of Title 18, United States Code, Section 371, unlawfully importing, and causing the unlawful importation of, merchandise into the United States contrary to law, in violation

of Title 18, United States Code, Section 545, illegally importing legally protected animals, in violation of Title 16, United States Code, Sections 1538(c) and 1540(b).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and/or in part only.

### III. APPLICABLE LAW

6.    The Endangered Species Act is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

7.    CITES is an international treaty among approximately 183 nations, including the United States and Indonesia that establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations.  Wildlife protected under CITES is divided into Appendices I, II, and III.  Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction.

8.    Title 50, Code of Federal Regulations, Section 23.13 generally provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III.  All wildlife listed in Appendix I may only be legally imported into the United States when accompanied by a CITES import permit issued by the United States and a CITES export permit or re-export certificate issued by the country from which the wildlife is exported.  All CITES Appendix II wildlife may only be imported into the United States when accompanied by an export permit or re-export certificate from the country from which the wildlife is being exported.  50 C.F.R. §§ 23.20(e), 23.35, 23.36.

9.    Asian arowanas (Scleropages formosus) are listed in CITES Appendix I.[1]

10.    Title 16, United States Code, Sections 1538(c), 1540(b), provide criminal sanctions for any person to knowingly engage in any trade in any specimens contrary to the provisions of CITES.

11.    Title 18, United States Code, Section 371 makes it unlawful for two or more persons to conspire, either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose,

---

[1] Asian arowanas (Scleropages formosus) are an endangered species and are also protected under the Endangered Species Act, Title 16, United States Code, Sections 1538, 1540(e) and 50 C.F.R. 17.11.

and one or more of such persons do any act to effect the object of the conspiracy.

12.   Title 18, United States Code, Section 545 makes it unlawful for a person to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

13.   The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal law that, among other things, makes it is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been or is intended to be either imported or transported in interstate or foreign commerce.   16 U.S.C. §§ 3372(d), 3373(d).

14.   Federal law generally provides that all importers of wildlife must file with the USFWS a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177), that is signed by the importer or the importer's agent, upon the importation of any wildlife at the place where USFWS clearance is requested.   See 50 CFR §§ 14.61 and 14.52.

## IV. STATEMENT OF PROBABLE CAUSE

15.   On February 10, 2017, I obtained an anticipatory search warrant from the Honorable Steve Kim, United States Magistrate Judge.   I hereby incorporate the statements in that affidavit, which is attached as Exhibit 1, to support probable

cause for the search warrant.  To summarize that affidavit, on February 9, 2017, a United States Customs and Border Protection inspection of a United States Postal Service parcel being imported from Hong Kong revealed eight live Asian arowanas (CITES Appendix I protected fish).  I have attached a photograph of the subject parcel (with contents: porcelain pots and bags of Asian arowanas) and a photograph of the bags of Asian arowanas removed from the porcelain pots in Exhibit 2.

16.  On February 10, 2017, I assisted in the execution of the anticipatory warrant of the parcel referenced above. Specifically, on February 10, 2017, I saw USFWS SA Juan Ramirez Amezcua, who wore a DHL uniform, drive a white cargo van, and park it on the street in front of LEE's residence.  SA Ramirez Amezcua delivered the parcel, containing eight Asian arowanas, to the residence.

17.  After the delivery, SA Ramirez Amezcua told me that an Asian male wearing a black baseball hat, exited a white Toyota Corolla parked in front of his cargo van, and met SA Ramirez Amezcua at the front gate of LEE's residence.  SA Ramirez Amezcua told me that the Asian male identified himself as SHAWN LEE and signed a manifest for the parcel with the name SHAWN LEE.

18.  After the package was accepted, I saw two Asian males walk quickly from the front of LEE's residence to a white 2017 Toyota Corolla, California license plate #7UTW825 that was parked on the street in front of the residence.  I saw one of the males, later identified as Justin Luu, get into the driver's

seat.  I saw the second male, later identified as LEE, wearing a
black hat and dark sweatshirt, and carrying a white plastic bag
in his hand, and get into the front passenger seat.  The bag
carried by LEE was fairly large and appeared to be heavy and
weighed down by its contents transport of wildlife.

19.  I then saw the white Toyota Corolla make a U-turn and
travel east away from LEE"s residence.

20.  I pulled up behind the white Toyota Corolla, along
with California Department of Fish and Wildlife ("CADFW") Warden
Ambartsum Bagdasaryan and Immigration and Customs Enforcement,
Homeland Security Investigations ("HSI") SA Andrew Kim in one
unmarked vehicle, and CADFW Wardens Paul Ton and Warden Brian
Huber in a marked CADFW law enforcement vehicle.  I communicated
with the other vehicles via radio and asked the Wardens to make
a traffic stop because I believe that the white bag contained
the Asian arowana fish.  I observed Wardens Bagdasaryan and Ton
activate their vehicles' emergency lights and stop the white
Toyota Corolla near the intersection of Woodbury Road and Taft
Street, in the city of Garden Grove.  I parked immediately
behind the two CADFW vehicles.

21.  I then approached the white Toyota Corolla with the
Wardens and SA Kim.  I identified myself to the two Asian males
sitting in the front seats and requested their driver's
licenses.  I asked both passengers to identify theirs.  The
driver of the vehicle identified himself Justin Luu and the
passenger as LEE.  I saw and recognized a white plastic bag on
the front passenger side floor board between LEE's legs.  I

asked LEE what was in the bag and he said, "fish." I asked LEE to hand the bag to one of the Wardens through the passenger side window. I confirmed with Warden Huber that the bag, a white plastic "Coco's" bag, contained the eight bags of Asian arowanas placed in the parcel SA Ramirez Amezcua and delivered to LEE's residence. (DHL Parcel with Airway bill number 9667953304 and its contents) search warrant 7MJ00297 2/10/17 signed by Magistrate Judge Steve Kim. I have attached a photograph of the eight bags of Asian arowanas retrieved from LEE in Exhibit 3.

22. I told LEE that agents had a search warrant for his residence on Ranney Ave. in Garden Grove and asked Luu to drive back to LEE's residence. LEE and Luu were cooperative and agreed to return to the residence. LEE told me that the residence was occupied by his parents. The Wardens had LEE step out of the vehicle and escorted him to their CADFW vehicle.

23. As LEE got out of the white Toyota Corolla, his smartphone was left on the front passenger seat. The Wardens transported LEE in their vehicle. I followed Luu in the White Toyota Corolla back to LEE's residence.

24. I later assisted with the search of the residence and learned that Agents located two bundles of cash in a bedroom, identified by LEE and his parents, as LEE's room. I saw as one of the bundles of cash, and learned from SA Ramirez Amezcua that $15,370, was seized and processed as evidence.

25. After the initial interview of Lee and search of the residence, SA Ramirez Amezcua, Warden Bagdasaryan and I interviewed LEE in the garage attached to LEE's residence.

During the interview, I gave LEE his smartphone and asked for consent to look at the content, to include pictures and messages.  LEE did not consent to the search of his smartphone. SA Ramirez Amezcua and I advised Lee that we were going to seize the phone, and cash, and parcel as evidence.  I then witnessed as LEE signed over possession of his smartphone along with the parcel and the $15,370 on a USFWS Property Receipt.

26.  After conclusion of the search warrant, SA Chee told me that the DHL parcel containing the Asian arowana fish was on the floor in the immediate entryway behind the front door at LEE's residence.  I also learned from SA Dean that during the interview, LEE expressed little knowledge about the contents DHL parcel, but told SA Dean that he was expecting the package.  SA Dean told me that LEE discussed his knowledge of Asian arowanas, and used the term "Arrows," which I know is a term of art of those who traffic in that type of fish.  SA Dean told me that LEE communicated through emails and phone calls, using the name "Bearbullies" and used his cellular phone number 714-300-8192.

A.  **Laboratory Results**

27.  On February 15, 2017, I sent two (deceased) of the eight seized Asian arowanas to the National Fish and Wildlife Forensic Laboratory ("NFWFL") in Ashland, Oregon, for examination and DNA analysis.  On April 13, 2017, I received and reviewed a copy of the Genetics Examination Report from Supervisory Forensic Scientist Mary Burnham Curtis, Ph.D.  The report confirmed that the species origin is Scleropages formosus (Asian arowana), which are included in CITES Appendix I and

9

listed as endangered under the Endangered Species Act ("ESA").
On April 27, 2017, SA Diehl received the two Asian arowanas from
the NFWFL and returned them to the FWS Torrance Field Office
evidence freezer.  I have attached a photograph of an Asian
arowana submitted to the NFWFL in Exhibit 4.

    **B.**   **Cellular Phone Extraction Results**

    28.  On February 13, 2017, I sent LEE's Samsung Galaxy Note
3 smartphone to the USFWS Digital Evidence Recovery and
Technical Surveillance Unit ("DERTSU") in Jacksonville, Florida.
On February 14, 2017, DERTSU Senior SA William Dennis received
the Samsung Galaxy Note 3.  On April 7, 2017, I received the
complete extracted results on a USB flash drive from SA Dennis.

    29.  On that date, I reviewed the text message results and
noted the following:

        a.  On February 1, 2017, LEE sent a text message to
phone number 714-661-0337, shown in LEE's contact list as Jason
Luu, which said, "All random, its [*sic*] for the arowans [*sic*] im
[*sic*] bringing in, going to smuggle them in myself and fuck
everyone else up."  On May 1, 2017, I conducted a search in TLO
for phone number 714-661-0337 and learned the phone number is
associated with Jason Q Luu and the address 5209 West Lehnhardt
Avenue, Santa Ana, California 92704.  I learned that the address
was also used by Justin Luu, the brother of Jason Luu.  Justin
Luu was previously identified as the driver of the white Toyota
Corolla transporting LEE and the fish.  Justin Luu was also
present during the search warrant at LEE's residence on February
10, 2017.

DHL Parcel Shipment from TANADI in Indonesia to LEE

b.   On February 7, 2017, LEE received an automated
text message from DHL, which said, "DHL Express 9667953304 from
Mr. Mickey is scheduled for delivery Feb 09 2017.  Signature is
required…"  I confirmed that the DHL tracking number in this
message, 9667953304, and the sender, Mr. MICKEY, were the same
information on the air waybill of the subject parcel delivered
to LEE at his residence on February 10, 2017 (Shipper: Mr.
MICKEY, JL.  Shinta No. 1, Bojong Indah – Rawa Buaya Cengkareng,
Jakarta, Indonesia 11610; Phone Number: +6285780639550).  Based
on my training and experience, I know that individuals involved
in the smuggling of wildlife use partial or fictitious names and
addresses to hide their identity.  I believe MICKEY TANADI used
the partial name "Mr. MICKEY" and a fictitious Indonesian
address on the air waybill to hide his identity.

30.  During the period of January 19, 2017 through February
10, 2017, LEE, using the identifier "Pumpkin420," which I
confirmed from the data DERTSU extracted from LEE's cellular
phone, communicated with MICKEY TANADI using the "LINE"
communication application.  LINE is a free instant messaging
platform for smartphones, which allows users to make calls, send
images, videos and text messages.

31.  On or about April 17, 2017, I reviewed the LINE
communication results and noted the following:

a.   On January 19, 2017, LEE sent TANADI a message
and wrote, "Im [sic] looking to order some dats…Arrows too."  I
know, from my experience as a USFWS Special Agent and

11

investigation into LEE, that "Dats" is short for Datnoid fish
and "Arrows" is short for Asian arowanas.  TANADI responded and
wrote, "Hmm but first thing first for arowana…You know in US the
fish is [*sic*] prohibited right?"  LEE wrote, "Yea [*sic*]."
TANADI replied, "We have the method to smuggle it…Is those [*sic*]
fish for you collection only or for resell brother?"  LEE wrote,
"Both haha."  TANADI replied, "For arowana, per smuggle we need
to collect 8 fishes at least (with 600 USD cost per shipment)."
LEE wrote, "Ok that works…How much per arrow?"  TANADI replied,
"Arowana super red, best quality, normal body – 750 USD…Red tail
golden, 250 USD…But minimum 8 pcs."  LEE wrote, "Ok no problem."
TANADI replied, "But one request brother...Pls [*sic*] make our
company or my name or even my country keep suspicious
[*sic*]…Don't let anyone know."  LEE wrote, "Yes sir I can promise
you that…How big will they be?"  TANADI replied, "To smuggle
maximum 10 cm…For smuggling I cannot guarantee 100% fish can
make it through shipping, but we can try to compensate bro."
LEE wrote, "Ok no problem… Ok thank you!  Im [*sic*] ready when
you are."  TANADI replied, "All of Asian arowana safe here with
me."

       b.   On January 20, 2017, LEE sent TANADI a message
and wrote, "Help me out bro, I have money to spend, we keep it
safe…What I do is hustle…Just like the arrows."  TANADI
responded, "Aro [*sic*] different haha we cannot declare it at
all."  TANADI then sent LEE an image of a disassembled speaker

next to clear plastic Kordon[2] bags and rubber bands on a floor
and wrote, "This is the secret method to do it LOL." LEE wrote,
"Let me know bro, can't wait…Send me everything." TANADI
replied, "We use special treatment water, with kordon bag (u
[sic] know this one right), and than [sic] we treat the fish
well, then smuggle it as "aquarium supplies…Now prepare
everything, bcos [sic] tbh [sic], last time get caught here
[sic], almost have problem with cops. LEE wrote, "No problem, I
deal with worse things than fish…" TANADI replied, "So actually
right now me and my boss just need to recharge our courage to do
it LOL…What else worse brother?" LEE wrote, "Sniff
sniff????…Smoke smoke?…" TANADI then sent LEE one image of
himself, which I later confirmed as TANADI from TANADI's
Indonesian identification card and passport photographs sent to
LEE.[3] LEE wrote, "All my life school no good for me, but hustle
life me good [sic]…I sell fish, dog, chickens, parrot…Everything
haha…Money no problem, I need trust."

      c.   On January 20, 2017, TANADI sent LEE a message
and wrote, "Bro, if we ship arowana in the beginning of February
how?...But I ask you a favor…Do not tell [sic] anything about
this illegal arowana to anyone, including my boss on Venus
Aquatics…This smuggling stuff only between you and me [sic]…For
the first trial, 8 RTG first." I know, from my experience and

---

   [2] Kordon bags are breathable plastic bags used in the
aquarium supply industry to ship fish.

   [3] On July 27, 2017, I confirmed the identity with SA Drew
Stewart with Department of State who inspected the photograph
TANADI sent and compared with authentic Indonesian passport
photographs.

training as a USFWS Special Agent, and my investigation into
LEE, that "RTG" is short for Red-tail arowana. LEE replied,
"Yes boss we do 8 RTG first." TANADI wrote, "So for first
shipment 8 pcs. x 250 = 2000 USD + shipping around 550 USD (if
the charge below 550, I will take that as your money in me)."
LEE replied, "No problem bro…Let me know how much the total is
bro." TANADI wrote, "…2550 USD." TANADI then sent LEE one
image of his Indonesian identification card and one image of his
Indonesian passport, passport number: XXX2373, and also
commented, "But do not tell about this arowana mission." LEE
replied, "Yes not arrow stuff, just legal stuff."

<u>Payment Instructions For the Arowana DHL Shipment</u>

      d.    On January 20, 2017, TANADI sent LEE six images
of aquarium supplies being prepared to smuggle fish and turtles
and wrote, "That's how we smuggle them." TANADI also sent Lee
one image of Asian arowanas. LEE responded, "Send me some
asap!!!" TANADI wrote, "6 February?" LEE replied, "Yea [*sic*]
tell me what you need and total cost." TANADI wrote, "Yes 2550
for first shipment bro…" LEE replied, "How much total? 250 x
20, 5,000? Plus shipping?" TANADI wrote, "Oh I think better
eight pieces first because this is our first deal [*sic*]. After
you received [*sic*] the fish, next week we can ship another 8."
LEE replied, "Ok…No problem, so how much?…Address at my
house…10591 Ranney Ave., Garden Grove, CA 92843." TANADI wrote,
"Bcs [*sic*] we don't want to make FedEx here be suspicious on
[*sic*] us and also, I think along with this [*sic*] small deals,
trust can be built between us…2550 USD including shipment RTG

plus all packing needs." LEE replied, "Ok no problem, I
appreciate it bro…"

    e.   On January 20, 2017, LEE sent TANADI a message
and wrote, "…Ok, how do I send you money? Paypal? Bank wire
transfer?…Do I get a certificate?" TANADI responded, "Wire
transfer…Swift code BCA: CENAIDJA, Bank account: 4790300047,
Beneficiary name: Mickey Tanadi, Bank: Central Asia, Indonesia,
2550 USD…If you want a certificate, better send separately bcos
[sic] we don't want to make they [sic] suspicious on the
certificate…The certificate, is not that 'big thing' because
every farm just can make their own certificate without any
government or organization, control or check it." LEE wrote, "I
know, I'm sure I can just make copies and change the number…Just
easier to sell with the certificate lol…People picky." TANADI
replied, "Or better, I send you my design and you can change the
number haha…I will provide the editable design okay…Just keep
this secret, all price will fine [sic] and you can control the
market." LEE wrote, "No problem bro…I will send money on Monday
for you, Ok?…The baby [sic] you get wild caught?" TANADI
replied, "Yes, all in the market is wild caught [sic]." LEE
wrote, "I know!!!!"

    f.   On January 21, 2017, TANADI sent LEE a message
and wrote, "Is it legal to use drugs there? Hahaha." LEE
responded, "What kind of drug bro?…Only smoking weed is Ok in
some states, not all of US…I have E pill, cocaine, special K,
crystal. Everything lol…These are illegal…Have you seen cocaine
before? Or try it?…You sniff it lol." TANADI wrote, "Can it

make me fly?"   LEE replied, "Make you Superman lol…Want to see?"
TANADI wrote, "Show me haha."   LEE sent TANADI four images of a
white substance[4].   TANADI wrote, "Just like a powder isn't it?"
LEE replied, "Yea [sic] you crush it and sniff it lol…In my
hand, 350 for that…Guess how much the white brick cost, it as
[sic] big as my hand…The more shinny it looks, the better the
coco haha…350 USD for that much in my hand, the whole white one
in the bag cost 17,000 USD lol."

g.   On January 24, 2017, TANADI sent LEE three images
of Asian arowanas.   LEE responded, "Morning bro, just filled out
the wire transfer, bank said they will send it out
tomorrow…Sorry bro, bank said I have wrong address for you, how
do you write your address?…For US like this, 10591 Ranney Ave.,
Garden Grove, CA 92843…Can you write your address for me please
so I copy exactly like you [sic]."   TANADI wrote, "Beneficiary
Address: JI Arjuna 1/12a RT/RW 010/09, West Jakarta, Jakarta
Indonesia…But I think based on my experience and training, I
know that paquet arrogats, such as these involving SWIFT codes
for wire transfers are used to receive payment.

h.   On January 27, 2017, LEE sent TANADI a message
and wrote, "Going to bank in 1 hour will let you know…Good

_____

[4] Based on my training and experience when I was a DEA
Special Agent, I know that large quantities of white powdery
substances and narcotics, such as cocaine, are often condensed
into brick shapes and placed in clear plastic bags.   I also know
that when pieces of cocaine are broken off of large condensed
bricks, those pieces look like white crystalized rocks.   The
pictures of white substances LEE sent to TANADI on January 21,
2017 display similar characteristics to that of cocaine, and
would therefore support LEE's messages that the images are of
cocaine.

morning bro, bank sent it today for you.  I used my friend's
account to send you money."  TANADI responded, "Ok…get any
receipt?"  LEE wrote, "Let me ask my friend sorry bro, first
time haha."  TANADI replied, "Ya [sic] hope fish business can
make you have another good source of income hehe [sic]."  LEE
wrote, "Drug money good but scary haha."  TANADI replied, "Me
here and my boss will support you totally on fish business hehe
[sic]…Anw [sic] bro, we shoot for 6 February right?"  LEE wrote,
"Haha yes."  TANADI replied, "Ok Ok.  I hope I already received
the money by Monday bro [sic]…Bcos [sic] need to prepare
everything, need to take the fish from supplier's place and buy
all shipment stuff."

        i.    On January 29, 2017, TANADI sent LEE a message
and wrote, "Bro, I already received the money."  LEE responded,
"Yay!  Thanks bro sorry for no receipt, next time I will make
sure."  TANADI wrote, "Cool man, just do order [sic] for all
shipment supplies…And I make sure all the water is ready
[sic]…On Wednesday morning (Indonesia time), I will got [sic]
the fish from supplier…Will give good food and treat the fish
for 3 days – then we need to starve them for 48 hours and on
Monday, shipment will be done."  LEE replied, "How long before
we do another shipment?"  TANADI wrote, "Arowana or legal
shipment?"  LEE replied, "Arowana."  TANADI wrote, "At least 2
weeks bro Hehe…Hope all things well and me don't get caught lol
[sic]."  LEE replied, "Haha you will be Ok."  TANADI wrote,
"Give me ur [sic] email brother."  LEE replied,
"Bearbulli3@gmail.com."

        j.    On January 30, 2017, TANADI sent LEE a message
and wrote, "Is it okay if we delay one day til [*sic*] 7...7 Feb...You
will receive Thursday ur [*sic*] time."  LEE responded, "Just want
to make sure you got [*sic*] the money, I was worry [*sic*] haha."
TANADI wrote, "Hahaha I already get [*sic*] the money, and I don't
want to make you worry...Anw [*sic*], I will provide the
certificate...You can print it first..."

        k.    On January 31, 2017, LEE sent TANADI an image of
an unknown amount of United States currency spread out on the
floor and wrote, "Only for you Ok."  TANADI responded, "Hahahaha
cool..."

        l.    On February 1, 2017, TANADI sent LEE two images
of Asian arowanas in a fish tank and one image of Asian arowana
certificates and wrote, "N [*sic*] check ur [*sic*] email also..."
TANADI, using email address: mickeytanadi5@gmail.com, sent an
Asian arowana certificate template to LEE's email address:
bearbulli3s@gmail.com.  TANADI then wrote, "Till [*sic*]
Monday/Tuesday, I will take care of them so they will be ready
for a long trip...Just a super friendly reminder, u [*sic*] will get
caught or pay big fines for keeping this [*sic*] fish (more [*sic*]
sell them LOL, just sell to someone you really trust yaa [*sic*]..."
LEE responded, "My operation will be good.  Fish don't live with
me and the people selling the fish will be little kids.  Haha."
TANADI wrote, "Yes yes, also pls [*sic*] keep my name secret
Hehe."  LEE replied, "Yes no problem."  TANADI wrote, "See the
certificate?...Better the fake one right haha [*sic*]...Now I'm
looking for the item for we [*sic*] smuggle the fiah [*sic*]...fish."

Wildlife Smuggling and Concealment

m.   On February 1, 2017, TANADI sent LEE one image of a ceramic pot to use as a potential means for smuggling fish and wrote, "This is the plan."  LEE responded, "Put in that?"  TANADI wrote, "No, put in the plastic bag first."  LEE replied, "Haha of course."  TANADI sent LEE one image of an aquarium filter to use as a potential means for smuggling fish and wrote, "Like this."  LEE replied, "Exciting!!!"  TANADI wrote, "So later we can ship more safely [sic]…Bcos [sic] as long as I heard [sic] the only inspection is on [sic] the store, when we give the goods."  Based on my experience training, I know that wildlife, to include Asian arowanas, are smuggled in aquarium filters and other household items to conceal their contents during the shipping and inspections.

n.   On February 2, 2017, LEE sent TANADI a message and wrote, "Can you send more than 8 next time?"  TANADI responded, "One shipment?…Will try…After bribe maybe can [sic]…"  LEE wrote, "Haha Ok let me know, I'll take care of you bro."  TANADI replied, "8 is from the last experience…Anw [sic] can you have some address in the future?...To make the DHL not suspicious."  LEE wrote, "Yes every wire money is different name [sic], every address will be a different name…Haha every shipment will go to each of my friends lol…first one go [sic] to my parent's house…Hahaha ya [sic] after 6 address [sic], just simply back to the first."

o.   On February 2, 2017, LEE sent TANADI one image of himself and his dog and wrote, "Me and Pumpkin lol."  TANADI

responded, "Wah [*sic*] for the first time I see ur [*sic*] face
LOL…Will try to bribe ASAP."   LEE then sent TANADI two images of
United States currency spread out on the floor and wrote,
"20,000 ready for you bro!"   I know from my investigation of LEE
and from the search warrant on February 10, 2017, that the image
is of LEE and his dog named "Pumpkin."   I also know from my
investigation into LEE and from evidence observed at his
residence during the search warrant, that LEE uses marijuana.
Based on my experience as a DEA Special Agent, I know that the
term "420" is used in the cannabis culture and when referring to
smoking marijuana.   I believe LEE's LINE application username
"Pumpkin420," incorporates his dog's name and his knowledge of
marijuana.

<u>Shipment of Asian Arowana Fish</u>

p.   On February 3, 2017, TANADI sent LEE a message
and wrote, "Bcos [*sic*] I still can't found [*sic*] the 'packaging'
of smuggling bro Haha [*sic*]…Now work to find it."   LEE
responded, "Need more bread bro?...It's Ok let me take care of
it…I send you more money Ok [*sic*]?"   TANADI wrote, "No no…I
can't find the fit [*sic*] pot to hide the fish."   LEE replied,
"Ok bro please let me know if u [*sic*] need to send you more
money [*sic*]…Haha it's Ok take your time."   TANADI wrote, "Bro I
got the pot Hehe…Now the seller send the pot to my home [*sic*]."
TANADI sent LEE one image of a ceramic pot and one image of a
bag of water.   LEE replied, "Haha whatever you feel safe [*sic*]."
TANADI replied, "Ok will do some experiment [*sic*]."

q.   On February 5, 2017, TANADI sent LEE one image of a fish in a bag of water and wrote, "Need ur [*sic*] receiver info…Ur [*sic*] number and full name receiver [*sic*]." LEE responded, "Shawn Lee, 10591 Ranney Ave., Garden Grove, CA 92843…7143008192." TANADI then sent LEE one image of a ceramic pot, one image of white cardboard boxes, and one image of himself in a vehicle and wrote, "Drive withut [*sic*] see what's behind lol…Pls [*sic*] pray for me." LEE replied, "Haha you will be Ok." TANADI wrote, "The scheduled arrival time should be Wednesday morning ur [*sic*] time…Will go to DHL 4 pm my time." TANADI sent LEE two images of white ceramic pots containing plastic bags and one image of bags of fish. LEE replied, "How many fish in a pot?" TANADI wrote, "1 pot - 2 fish…But I will send you 5 or 6 pots…Just in case the DHL guy wants to open." I personally inspected the DHL parcel seized on February 9, 2017, that contained six ceramic pots. I saw that four of the six pots contained two bags of fish each. The ceramic pots containing the bags of fish and white cardboard boxes shown in the images TANADI sent to LEE, via text message, appear to be the same items that were seized by USFWS Special Agents.

r.   On February 6, 2017, TANADI sent LEE one image of a DHL employee and one image of the commercial invoice for the shipment. LEE responded, "Look you take a picture of him [*sic*]." TANADI wrote, "Yeah…9667953304…Here's the airway bill…Here's today's shipment breakdown: Fish: 2000 USD, DHL: 420 something, The pot: 80 USD, Kordon bag + some supplies: +/- 50 USD." LEE replied, "Okay haha." TANADI wrote, "I hope all 8

fish will safely arrived [*sic*]…Anw [*sic*] with the airway bill
you can check it through DHL''s website." LEE replied, "I will
keep checking it to make sure." On February 10, 2017, I
personally inspected the DHL parcel materials this Airway bill
number and I know that it contained eight live Arowana Fish.

         s.   On February 7, 2017, TANADI sent LEE a message
and wrote, "I just checked on the web and they said the
estimated arrival time is on Thursday by the end of the day."
LEE responded, "Hopefully fish come in good bro." TANADI wrote,
"Yaa [*sic*] tbh [*sic*] me worry, but still hope that at least 6
fish alive in ur [*sic*] place." LEE replied, "Haha I prepare for
the worst…Maybe ask when their next flight is to US, so fish
don't have to wait there…No problem we both have to risk to make
money…"

         t.   On February 8, 2017, TANADI sent LEE one image of
an Asian arowana in a fish tank and wrote, "This is the worst
that I keep [*sic*], I order [*sic*] 9 from supplier, in case, if
there's any sudden death…The good one already send all to you
[*sic*]." LEE responded, "Thank you bro…Everything good, just
waiting." TANADI wrote, "Really? Is it possible to receive it
tonight ur [*sic*] time?" LEE replied, "No, that's US Customs
after they clear it, it will go to Irvine. I have to pick it up
in Irvine tomorrow morning hopefully." TANADI wrote, "I think u
[*sic*] better contact DHL." LEE replied, "Really?" TANADI
wrote, "I just see there is pending custom [*sic*]…Afraid they
know of the fish." LEE replied, "They say in custom you cannot
go pick up [*sic*]…" TANADI wrote, "Oh but they do not tell [*sic*]

anything bad about the shipment right?"  LEE replied, "Will see tomorrow morning, I will go there right away…Nothing bad bro haha…Yea [sic] they said package is still in LA."

u.   On February 9, 2017, TANADI sent LEE a message and wrote, "Want to make sure everything's good bro."  LEE responded, "Yea [sic] play it safe no rush, rather us be safe then they find fish and we no good lol [sic]."  TANADI wrote, "Hope all things fine…I am still optimist bro!…Pray pray haha."  LEE replied, "I called DHL, they will call LA custom and call me back why my package not here yet [sic]…lol…Haha damn bro they found it, sorry…They said they detained my shipping package, they will send me a letter in the mail in 30 days."  TANADI wrote, "Is it leaking?"  LEE replied, "Lono [sic] DHL just told me that, they did not let me ask a question."  TANADI wrote, "Can I be chased?"  LEE replied, "No you won't Haha."  TANADI wrote, "Hope you are not in big trouble as well..."  LEE replied, "Haha it's OK, this is nothing to before…Maybe send me a lot of pots…Hard to find with more pots…Yea [sic] new everything again."  TANADI wrote, "This shipment I use 6 pot [sic]…+8 aros [sic] inside, already 26 kg."  LEE replied, "DHL just called me…I did not pick up.  They said my shipment will come tomorrow now…They said custom release late [sic]."  TANADI wrote, "You will get empty pot?  Haha."  LEE replied, "I don't know…Maybe empty or they deliver with fish and game lol…I will have my mom receive the shipment at home and I will wait to see if the police come."  TANADI wrote, "Can go to jail is it

[*sic*]?"  LEE replied, "Already change new phone so no
pictures…Yea [*sic*] jail time for sure."

        v.   On February 10, 2017, TANADI sent LEE a message
and wrote, "How was DHL?"  LEE responded, "Package is going to
Irvine right now…I'm going to see if I can pick it up."  TANADI
wrote, "Don't want you get into problem [*sic*]."  LEE replied,
"Haha it's Ok me have a plan incase [*sic*]."  TANADI wrote,
"What's the plan?"  LEE replied, "I shoot the police…Lol…Jk
[*sic*]…Still waiting."

        w.   On February 10, 2017, at approximately 3:40 pm.,
immediately after SA Ramirez Amezcua delivered the subject
parcel to LEE's residence, LEE sent TANADI a message and wrote,
"Fish good bro!!!...Everyone made it."  TANADI replied,
"Really???…Take a photo…So what happened with Customs?"  At
approximately 3:50 p.m., LEE was detained and received a missed
call from TANADI.  At 4:48 p.m., TANADI sent LEE a final message
and wrote, "Everything Ok bro?"

## V.  CONCLUSION

    32.  Based on the foregoing facts, I believe there is
probable cause to charge SHAWN NAOLU LEE and MICKEY TANADI with
conspiracy to commit an offense or to defraud the United States,
in violation of Title 18, United States Code, Section 371,
unlawfully importing, and causing the unlawful importation of,
merchandise into the United States contrary to law, in violation
of Title 18, United States Code, Section 545, illegally

importing legally protected animals, in violation of Title 16,

United States Code, Sections 1538(c) and 1540(b).

Adam Diehl, Special Agent
United States Department of
the Interior, United States
Fish and Wildlife Service

Subscribed to and sworn before me
this ‖th day of August 2017.

HONORABLE   ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

AO93
(Rev.8/82)

ORIGINAL

## ANTICIPATORY SEARCH WARRANT ON WRITTEN AFFIDAVIT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| **UNITED STATES OF AMERICA**<br>v. | DOCKET NO.　　　　MAGISTRATE'S CASE NO.<br><br>**17MJ00297** |
| **THE PREMISES KNOWN AS:**<br>Location in which visual surveillance indicates the parcel DHL package bearing Air Waybill Number 9667953304 has been accepted for delivery located at 10591 Ranney Ave., Garden Grove, CA 92843. | TO:<br>**ANY SPECIAL AGENT(S) WITH UNITED STATES FISH AND WILDLIFE SERVICE OR ANY OTHER AUTHORIZED OFFICER** |

Affidavit having been made before me by the below-named affiant that he/she has reason to believe that on the premises known as

### SEE ATTACHMENT A

in the Central District of California

there will be concealed certain property, namely:

### SEE ATTACHMENT B

and as I am satisfied that there is probable cause to believe that <u>upon the occurrence of the triggering event described in Section VI of the search warrant affidavit</u>, the property so described will be concealed on the person or premises above-described and the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit which is incorporated herein by reference and attached hereto.

**YOU ARE HEREBY COMMANDED** to search on or before _____ **fourteen (14) days** (not to exceed 14 days) the person or place named above for the property specified, serving this warrant and making the search at any time in the day or night <u>upon the occurrence of the event described above</u>, and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to <u>the duty U.S. Magistrate Judge</u> as required by law.

| NAME OF AFFIANT<br><br>**Adam Diehl, United States Fish and Wildlife Service** | SIGNATURE U.S. MAGISTRATE JUDGE<br><br>**The Honorable Steve Kim** | DATE/TIME ISSUED<br>2/10/17<br><br>11:30 AM |
|---|---|---|

AUSA: ERIK M. SILBER and AMANDA M. BETTINELLI

| RETURN | | |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

**INVENTORY MADE IN THE PRESENCE OF**

INVENTORY OF PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of all the property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____    _____
**U.S. JUDGE OR MAGISTRATE**                    **DATE**

ATTACHMENT A

PREMISES TO BE SEARCHED

The SUBJECT PREMISES to be searched -- only after the event that triggers the anticipatory search warrant, i.e. delivery and acceptance of the DHL parcel bearing Air Waybill 9667953304 and addressed to Shawn Lee -- is located at 10591 Ranney Ave., Garden Grove, California 92843.  It is a single story light yellow stucco house with a black shingled roof and grey wood decorative trim below the roofline.  It has a two-car white garage next to an iron gate that leads to a front door.  There is a window on the front side of the house opposite to the garage and a small patch of grass in the front yard.

i

ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized from 10591 Ranney Ave., Garden
Grove, California 92843 (the "SUBJECT PREMISES") constitute
evidence, fruits, and/or instrumentalities of violations of 16
U.S.C. §§ 1538(c), 1540(b); 50 C.F.R. §§ 23.13, 23.20 (illegally
importing legally protected animals), 16 U.S.C. §§ 3372(d),
3373(d)(3)(A)(i) (submitting a false record or label for
wildlife intended to be imported), and 18 U.S.C. § 545
(smuggling goods into the United States), namely:

a.    A DHL parcel with Air Waybill number 9667953304
and addressed to Shawn LEE at 10591 Ranney Ave., Garden Grove,
California 92843, and its contents, including live Convention on
the International Trade in Endangered Species of Wild Fauna and
Flora ("CITES") protected wildlife.

b.    Any other CITES-protected wildlife.

c.    Records relating to the purchase, importation,
transportation, storage, possession, transfer, disposition,
trade, sale, offer to purchase, or offer for sale of CITES-
protected wildlife, including notes, memos, notebooks, books,
correspondence regarding CITES-protected wildlife, invoices,
shipping records, packing slips, facsimiles, purchase orders,
bills of sale, shipping records, letters of credit, permits,
customs forms, contracts, importation documents, receipts,
customer lists, price lists, financial records, cancelled
checks, check book ledgers, money orders, wire transfers, bank
statements, international bank transfer statements, cashier

[Non-Instrumentality Protocol]

checks, credit card statements, personal telephone directories, and photographs; and

   d.  Records and documents reflecting communications with government agencies, consumer associations, and business associations about CITES-protected wildlife, or the requirements for the importation or exportation of wildlife under CITES, including documents or licenses regarding compliance or non-compliance with governmental rules and regulations, or declarations, permits, and licenses required by governmental rules and regulations to import, export, or transport wildlife products.

   e.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii

[Non-Instrumentality Protocol]

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.  evidence of the times the device was used;

vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

iv

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at

v

that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

[Non-Instrumentality Protocol]

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

vii

[Non-Instrumentality Protocol]

g.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.  If the search determines that a digital device contains data falling within the list of items to be seized, the government may also retain the device itself, without further order of the Court.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

viii

[Non-Instrumentality Protocol]

       c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

       d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

       e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

       f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

       g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

[Non-Instrumentality Protocol]

<u>AFFIDAVIT</u>

I, Adam Diehl, being duly sworn, declare and state as follows:

## I.      INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement, stationed in Torrance, California.   I am authorized by the Secretary of the Interior to conduct searches and seizures and to make arrests, as authorized by law, pursuant to the Lacey Act, Title 16, United States Code, Section 3371 et seq.   I am an investigative law enforcement officer of the United States within meaning of Title 16, United States Code, Section 3375, and a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure. I have been so employed since May of 2016.

2.    I was previously employed as a Special Agent with the Department of Justice, Drug Enforcement Administration ("DEA") in Los Angeles, California for approximately two years, and a Law Enforcement Officer with the United States Forest Service, Law Enforcement and Investigations in Southern California for approximately six years.   I received a Bachelor's degree in Social and Criminal Justice from Ashford University in July of 2013.   I am also a graduate of the Fullerton College Police Academy in Fullerton, California, the Land Management Police Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, the DEA Basic Special Agent Academy in Quantico, Virginia, and the USFWS Special Agent Basic School

("SABS") at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.    During the last eight years, I have conducted several complex investigations involving the protection of natural resources and United States government property, arson, firearms violations, narcotics trafficking, money laundering, and fish and wildlife violations. Since my employment with the USFWS in 2016, I have conducted, or been involved in, multiple search warrants relating to the illegal commercialization of protected fish and wildlife, and violations of federal fish and wildlife laws. I have read, studied and received training on the laws enforced by the USFWS. I have also received advanced training in numerous aspects of criminal investigative techniques, including electronic surveillance and the application of undercover techniques for criminal investigations.

## II.    PURPOSE OF THIS AFFIDAVIT

4.    This affidavit is made in support of an application for an anticipatory search warrant for the premise located at 10591 Ranney Ave., Garden Grove, CA 92843 (the "SUBJECT PREMISES") for evidence, fruits, and/or instrumentalities of violations of 16 U.S.C. §§ 1538(c), 1540(b); 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally protected animals), 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported), and 18 U.S.C. § 545 (smuggling goods into the United States). This anticipatory search warrant will be executed only upon the receipt of the DHL

2

[Non-Instrumentality Protocol]

parcel described below by an individual at the SUBJECT PREMISES
and the occurrence of the circumstances described in Section VI
of this affidavit.

5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and/or
information obtained from various law enforcement personnel and
witnesses.   This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.   Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.


III.   **PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED**

6.    The SUBJECT PREMISES is located at 10591 Ranney Ave.,
Garden Grove, CA 92843, and is described in detail in Attachment
A, which is incorporated herein by reference.

7.    The items to be seized, which constitute evidence,
fruits, and/or instrumentalities, of violations of 16 U.S.C.
§§ 1538(c), 1540(b); 50 C.F.R. §§ 23.13, 23.20 (illegally
importing legally protected animals), 16 U.S.C.
§§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or
label for wildlife intended to be imported), and 18 U.S.C. § 545
(smuggling goods into the United States), are listed in
Attachment B, which is incorporated herein by reference.


3

[Non-Instrumentality Protocol]

## IV.   APPLICABLE LAW

8.   The Endangered Species Act is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

9.   CITES is an international treaty among approximately 183 nations, including the United States and Indonesia that establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations.  Wildlife protected under CITES is divided into Appendices I, II, and III.  Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction.

10.   Title 50, Code of Federal Regulations, Section 23.13 generally provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III.  All wildlife listed in Appendix I may only be legally imported into the United States when accompanied by a CITES import permit issued by the United States and a CITES export permit or re-export certificate issued by the country from which the wildlife is exported.  All CITES Appendix II wildlife may only be imported into the United States when accompanied by an export permit or re-export certificate

4

[Non-Instrumentality Protocol]

from the country from which the wildlife is being exported.   50
C.F.R. §§ 23.20(e), 23.35, 23.36.

11.   Asian Arowana (Scleropages formosus) are listed in
CITES Appendix I.

12.   Title 16, United States Code, Sections 1538(c),
1540(b), provide criminal sanctions for any person to knowingly
engage in any trade in any specimens contrary to the provisions
of CITES.

13.   Title 18, United States Code, Section 545 makes it
unlawful for a person to "fraudulently or knowingly import or
bring into the United States, any merchandise contrary to law,
or receive, conceal, buy, sell, or in any manner facilitate the
transportation, concealment, or sale of such merchandise after
importation, knowing the same to have been imported or brought
into the United States contrary to law."

14.   The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal
law that, among other things, makes it is unlawful for any
person to make or submit any false record, account, or label
for, or any false identification of, any fish, wildlife, or
plant which has been or is intended to be either imported or
transported in interstate or foreign commerce.   16 U.S.C.
§§ 3372(d), 3373(d).

15.   Federal law generally provides that all importers of
wildlife must file with the USFWS a completed Declaration for
Importation or Exportation of Fish or Wildlife (Form 3-177),
that is signed by the importer or the importer's agent, upon the

5

importation of any wildlife at the place where USFWS clearance
is requested.  See 50 CFR §§ 14.61 and 14.52.

V.    STATEMENT OF PROBABLE CAUSE

16.  On February 9, 2016, USFWS SA Stephanie Johnson told
me that a package of fish had been intercepted by United States
Customs and Border Protection ("CBP") officers at the DHL
shipping facility located at the Los Angeles International
Airport ("LAX").  According to SA Johnson, USFWS Wildlife
Inspector ("WI") Ali Ventura told her that CBP called the USFWS
Torrance office and reported finding fish concealed in a box of
pots.  I later learned from WI Kyle McCune, that CBP Officer
Bernard Schirmer called the office around 9:00 a.m., and told
him that he found fish while examining a box labeled as pots at
the DHL LAX shipping facility.  WI McCune also told me that
Officer Schirmer requested the inspectors respond to DHL to
inspect the fish, and that he relayed the information to WI Ali
Ventura.

17.  On February 9, 2017, SA Johnson, SA Juan Ramirez-
Amezcua, and I drove to the DHL LAX shipping facility and made
contact with CBP Officer Schirmer.  Officer Schirmer told me
that, on February 9, 2017, at approximately 7:30 a.m., he
examined a DHL box (the "SUBJECT PARCEL") that arrived from
Indonesia.  According to Officer Schirmer, the description of
the goods on the air waybill (DHL Air Waybill #9667953304) was
six "Porcelain Herbal Pot", but he felt moisture on the side of
the box.  Officer Schirmer told me he opened the box and found
six boxes containing porcelain pots inside each box.  Officer

6

[Non-Instrumentality Protocol]

Schirmer told me he opened up two of the six boxes, removed the lids, and found two bags of fish inside each pot. Officer Schirmer then told me he placed the pots and boxes back in the box and contacted the USFWS.

18.  I observed the SUBJECT PARCEL sitting on top of a receiving belt in the CBP examination area, and took photographs of the outside of the box and commercial invoice, which was affixed to the top of the box. I observed the following information on the commercial invoice: Air Waybill Number: 9667953304. Shipper: Mr. Mickey, JL. Shinta No. 1, Bojong Indah – Rawa Buaya Cengkareng, Jakarta, Indonesia 11610; Phone Number: +6285780639550. Receiver: Mr. Shawn Lee ("SHAWN LEE"), 10591 Ranney Ave., CA, 92843; Phone Number: 714-300-8192. Full Description of Goods: Porcelain Herbal Pot; Quantity: 6; Unit Value: 100.00; Total Declared Value: 600.00; Country of Manufacture: Indonesia.

19.  I then took photographs of the contents as SA Ramirez-Amezcua and Officer Schirmer opened SUBJECT PARCEL. I observed a total of six small white cardboard boxes containing white porcelain pots with lids inside each box. I also observed and photographed each pot as the lids were removed and the contents were revealed. Four of the six porcelain pots contained two clear plastic bags with water and fish, and two of the six porcelain pots were empty. There was a total of eight fish inside the box. SA Ramirez-Amezcua told me that, based on his training and experience, he believed the eight fish in the bags were Asian Arowana, listed in CITES Appendix I.

7

[Non-Instrumentality Protocol]

20.    SA Ramirez-Amezcua and I then placed the porcelain pots and fish back inside of the box and transported the SUBJECT PARCEL back to USFWS Torrance Office.  I maintained custody of the SUBJECT PARCEL until SA Ramirez-Amezcua and WI Frank Chu and WI Cory Kawabata removed the fish from the porcelain pots and bags, and placed them into a fish tank at the USFWS Torrance Office.

21.    Later, on February 9, 2016, SA Ramirez-Amezcua forwarded an email to me with a preliminary identification of the fish by USFWS Senior Forensic Scientist Mary Burnham Curtis, Ph.D., from the National Fish and Wildlife Forensic Laboratory in Ashland, Oregon.  The email included photographs of the fish removed from SUBJECT PARCEL, taken by SA Ramirez-Amezcua. According to Senior Forensic Scientist Burnham Curtis, the characteristics of the fish, including the lateral line scale count of 22-23, is consistent with Asian Arowana (Scleropages formosus), listed in CITES Appendix I.

22.    On February 9, 2017, I searched in the TLO Trans-Union Intelligence ("TLO") database and confirmed that the receiver on the SUBJECT PARCEL, SHAWN LEE, lives at the address listed on the commercial invoice, 10591 Ranney Ave., Garden Grove, California 92843, the SUBJECT PREMISES.  I also located phone number 714-383-2382, which was listed as a mobile phone associated with SHAWN LEE and the SUBJECT PREMISES.  The TLO database contains records related to ownership and occupancy of property, personal identity, employment, vehicle registration, and other such records that are available with a subscription.

8

[Non-Instrumentality Protocol]

23.   On February 9, 2017, SA Johnson conducted an open source Google search of phone number 714-383-2382 and informed me that she located an email address Shawnlee88@yahoo.com and a username Lidofishieboi, associated using LEE.  SA Johnson also told me she conducted an open source internet search of Lidofishieboi and found comments and/or postings from same on the following blogs: marinebreeder.org, goldfishkeepers.org, chameleonforums.com, reef2reef.com, simplydiscus.com, and reefcentral.com, all sites used to sell and discuss fish and other wildlife.  On February 9, 2017, I reviewed screen shots and the phone number 714-383-2382 was listed as a contact number for Lidofishieboi on reefcentral.com which was the phone number number was associated with the TLO database for SHAWN LEE.

24.   On February 9, 2017, SA Ramirez-Amezcua conducted a query of the Law Enforcement Management Information System ("LEMIS"), a database maintained by the USFWS, a database maintained by the USFWS that contains records involving the importation and exportation of wildlife, including permits and declarations.  He informed me that the query did not identify any Form 3-177 declaration for wildlife, any CITES import permit for Asian Arowana, or any records for any shipments relating to SHAWN LEE.

25.   On February 9, 2017, I spoke with DHL Security Supervisor Robert Candia, who told me that an individual named SHAWN LEE called the DHL customer service to find out the status of the delivery.  According to Mr. Candia, the caller left the name SHAWN LEE and phone number 714-300-8192, the same

9

[Non-Instrumentality Protocol]

information as found on the SUBJECT PARCEL, with the Customer
Service representative.  I also spoke with DHL representative
Fabiola Duran, who told me she called phone number 714-300-8192
and left a message for SHAWN LEE, informing him that the package
was scheduled to be delivered in the afternoon on February 10,
2017.

26.  Based on my training and experience (and information
provided to me by other experienced USFWS special agents with
whom I work), I have learned that individuals who traffic in
CITES-protected wildlife, such as here, also traffic in other
types of CITES-protected wildlife.  Thus, there is probable
cause to believe that additional CITES-protected animals will be
found at the SUBJECT PREMISES.

27.  Based on my training and experience (and information
provided to me by other experienced USFWS special agents with
whom I work), I have learned that individuals who illegally
import CITES-protected wildlife to their residences are likely
to keep equipment, records, and/or correspondence related to
illegal importations at their residence.

28.  The SUBJECT PARCEL that was intercepted on February 9,
2017, was being shipped from an overseas shipper in Indonesia.
Based on my training and experience (and information provided to
me by other experienced USFWS special agents with whom I work),
I have learned that international trafficking of wildlife,
including the parts thereof, are often facilitated using email,
cell phones, and/or text messages and, thus, there is probable
cause to believe that digital evidence related to the unlawful

10

[Non-Instrumentality Protocol]

wildlife trafficking in this case will be found at the SUBJECT
PREMISES.

VI.   CIRCUMSTANCES THAT WILL ACTIVATE THE ANTICIPATORY SEARCH
      WARRANT FOR THE SUBJECT PREMISES

      29.   The anticipatory search warrant to search the SUBJECT
PREMISES described herein will be triggered by the following
circumstances:

      a.   Within the allowable time prescribed by the
warrant, an individual working with law enforcement, acting in
an undercover capacity as a DHL delivery person, will deliver
the SUBJECT PARCEL to the SUBJECT PREMISES.

      b.   It is anticipated that the SUBJECT PARCEL
containing the wildlife will be accepted by an individual who is
present at SUBJECT PREMISES and will be taken inside the SUBJECT
PREMISES.  The SUBJECT PARCEL will be kept under observation
using physical surveillance until the time that it is taken into
the residence.  Once the SUBJECT PARCEL has been delivered and
taken inside the SUBJECT PREMISES, USFWS SAs will wait
approximately ten to thirty minutes before entering the SUBJECT
PREMISES.  Thus, the triggering event to activate this
anticipatory search warrant, and permit its execution, will be
delivery and acceptance of the SUBJECT PARCEL at the SUBJECT
PREMISES.

[Non-Instrumentality Protocol]

## VII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible

12

to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

        b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

        c.   The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of

13

[Non-Instrumentality Protocol]

data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive
could contain as many as approximately 450 full run movies or
450,000 songs.

          d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files

14

are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory

15

paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data

16

on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby

17

[Non-Instrumentality Protocol]

traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.

31.  The USFWS has only five local agents and no local
forensic examiners.  On February 9, 2017, USFWS Torrance Office
Resident Agent in Charge Erin Dean told me that she had
attempted to contact nearby forensic examiners, but was unable
to find a forensic examiner to participate in the execution of
the warrant on February 10, 2017.  We need to execute the
warrant on February 10, 2017, because the SUBJECT PARCEL is
supposed to be delivered on February 10, 2017.  I know,
including from different search warrants obtained and executed
with similar circumstances, that we have a difficult time
getting forensic assistance from other federal agencies on
search warrants on short notice.  I, thus, intend to seize
digital devices during the execution of the search warrant and
send them to our Digital Evidence Recovery and Technical
Surveillance Unit located in Jacksonville, Florida, for imaging,
and will promptly return the digital devices to residence.

32.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

[Non-Instrumentality Protocol]

## VIII.   <u>CONCLUSION</u>

33.   For all the reasons described above, I respectfully submit that there is probable cause to believe that evidence, fruits, and/or instrumentalities of violations of 16 U.S.C. §§ 1538(c), 1540(b); 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally protected animals), 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported), and 18 U.S.C. § 545 (smuggling goods into the United States) will be found at the SUBJECT PREMISES.

_____
ADAM DIEHL, Special Agent,
USFWS

Subscribed to and sworn before me
this 10th day of February, 2017.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

19

[Non-Instrumentality Protocol]

EXHIBIT 2

EXHIBIT 2

DHL package containing porcelain pots and bags of Asian arowanas



Bags of Asian arowanas removed from porcelain pots



EXHIBIT 3

## EXHIBIT 3

Eight bags of Asian arowanas retrieved from SHAWN LEE



EXHIBIT 4

EXHIBIT 4

Asian arowana

